IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2025

## IN RE FRED M.[1]

**Appeal from the Juvenile Court for Shelby County**
**No. FF9649   W. Ray Glasgow, Magistrate**

_____

## No. W2025-00208-COA-R3-PT

_____

This action involves the termination of a father's parental rights to his minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish statutory grounds of termination. The court also found that termination was in the child's best interest. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY ARMSTRONG, J., joined.

Anna L. Phillips, Germantown, Tennessee, for the appellant, Fred M.

Jonathan Skrmetti, Attorney General & Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. BACKGROUND

Fred M., III ("Child") was born to Fred M., II ("Father") and Marquesha J. ("Mother")[2] in 2019. At the time of trial, the Child was five years old.

Father has an extensive criminal history, including prior convictions of aggravated

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

[2] Mother surrendered her parental rights on March 1, 2023.

assault in 2006, domestic assault in 2009, and aggravated assault and assault in 2019, as well as multiple prior probation revocations. At trial, Father estimated he had been incarcerated seven or eight times since he was eighteen years old.

Father is also well known to the Tennessee Department of Children's Services ("DCS"). Before the Child was born, four of Father's older children were removed into DCS custody after Father had a physical altercation with the maternal grandmother's husband. The children were returned to Father five years later. In August 2021, DCS filed a dependency and neglect petition concerning the Child and his siblings based on allegations of lack of supervision and domestic violence. The report of the guardian *ad litem* noted that one of the children stated Father "hit and kicked the mother" on "a lot of days." Subsequently, in October 2021, the trial court entered an order for the children's removal from the parents and placement in DCS custody. The daughters were immediately taken into foster care, but Father asserts nobody ever contacted him requesting that he relinquish the Child. A custodial interference charge arose when Father did not turn the Child over to DCS. According to Father, he was unaware the Child was supposed to be in DCS's custody and the Child remained in the home with Father and Mother. On May 7, 2022, Father was arrested, and the Child was physically removed from Father and placed in foster care with his sisters. On April 20, 2023, the Child was adjudicated dependent and neglected based on Father's domestic violence, physical abuse, and severe child abuse against the Child's half-sibling, Marki.

Following the Child's removal, Father pled guilty to assault and custodial interference on May 9, 2023, and was sentenced to 11 months and 29 days and one year, respectively. Father later testified at trial that he pled guilty to assault—which violated his probation for a prior conviction— "just to get it over with," and that he pled guilty to custodial interference because it was in his best interest.

On July 14, 2023, DCS petitioned to terminate the parental rights of Father to the Child and his four sisters, Tyme M., Macie M., Autumn M., and Amora M. On April 19, 2024, the court entered an order dismissing DCS's petition as to Tyme, Macie, Autumn, and Amora after Father surrendered his parental rights to them. DCS proceeded as to the Child on the grounds of persistence of conditions and failure to manifest a willingness and ability to assume custody.

Upon discovering an order from January 10, 2024, which included a finding that a half-sibling, Marki J., was a victim of severe physical abuse by Father, DCS filed an amended petition on June 17, 2024, to add the ground of severe child abuse. Prior to trial, Father's attorney moved to withdraw because Father had sent a letter discharging her. At trial before the juvenile court on November 21, 2024, Father explained that he desired to fire his attorney because DCS added the severe child abuse ground as a basis for termination of his parental rights and the attorney had done nothing in his defense. He stated in the letter:

You have not discussed defense over with me. I feel like I'm being prepared for the slaughter [and] I don't know what I'm walking into. The trial that starts in November will have to be continued because I do not have proper representation. . . . As of today you do not have my consent to make legal determinations on my behalf. . . .

After reviewing the information before him, the trial court informed Father that his discharge request resulted in a delay of the proceedings. DCS and the guardian *ad litem* opposed the motion to withdraw, arguing that Father was attempting to delay the matter until his release from jail. Upon DCS relating to the court that it planned to dismiss the severe abuse allegation, making Father's reason for discharging his attorney a non-issue, the trial court denied Father's attorney's motion to withdraw, despite Father's dissatisfaction.

Additionally, Father's attorney moved to continue the trial because Father was attending by Zoom, and no order had been entered to allow him to participate in that manner. The court observed that despite there being an "[o]rder in the jacket to transport [Father]," the sheriff's department did not honor the request by Father's attorney to transport Father to attend in-person. The trial court decided to conduct the trial with Father participating by Zoom. Father's attorney was directed by the court to remain available to assist Father as he represented himself. Prior to the start of proof, DCS dismissed the amended petition and the ground of severe child abuse.

Father was the first witness at trial. He testified he was serving a four-year sentence at Shelby County Correctional Facility, from which he was scheduled to be unconditionally released on February 4, 2025. He acknowledged that he had multiple disciplinaries during his incarceration, most recently in December 2023. Father testified he completed anger management classes while at the facility. Father stated the jail did not offer parenting classes and that he tried to complete a mental health evaluation but could only do so with a court order.[3]

Father testified that he and Mother have been married for eleven years. He related that Mother was a medical assistant and he had worked for a renovation company. Father asserted that when they both worked, their combined household income was about $5,000 per month. He claimed that he planned to divorce Mother but had not yet filed.

To obtain employment after incarceration, Father declared that he had spoken with the office of reentry and that he was still in good standing with PeopleReady, an employment agency that he believed would hire him. He asserted that he had spoken with

---

[3] The trial court found Father "was not a truthful witness" and credited contrary testimony by other witnesses over Father's testimony.

HopeWorks, which offers classes for a commercial driver's license and could assist him with paying fines to reinstate his driver's license. Father testified that he has about $3,500 in cash savings and some stocks he can liquidate to provide for himself.

When asked where he planned to live once he was released from jail, Father was hesitant to respond. After the court instructed him to answer, he provided a Memphis address and stated that it was the house of his aunt and uncle. Father claimed that he intended to get a job, assimilate into society, and do whatever DCS needed him to do. He planned to avoid trouble and future criminal issues by avoiding people, including family, with whom he has had issues.

As to his relationship with the Child, Father described a strong bond with his son and claimed to be his favorite person. However, he admitted to not seeing the Child since May 2022 and to not seeking to lift the no-contact order.[4]

The second witness was Makesha McKinney, DCS Family Services Worker ("FSW"). She admitted not discussing the tasks in the permanency plan with Father and related that the Child has not visited with Father because of the no contact order. She stated that she has visited the Child a dozen times, but usually only one-on-one for a short time. Ms. McKinney observed that the Child has never talked or asked about Father. She opined that there's "no bond between them."

Ms. McKinney related that she did not believe Father's incarceration or the conditions that exist will be remedied soon so that the Child can be returned to a home with Father. She believed continuation of the parental relationship greatly diminishes the Child's chances of being placed in a safe, stable, and permanent home. She observed that the Child is currently placed with his maternal grandmother ("Grandmother"), with whom he has a great bond. He has lived in the foster home with Grandmother continually since May 2022 with his four sisters and half-brother, all of whom Grandmother has adopted. Ms. McKinney noted that DCS has received no documentation that Father completed anger management classes.

Marki, Mother's son and Father's stepson, testified that when he lived with Father and Mother, they argued and the environment was violent. Marki related that once when Mother lost something, Father got angry and hit her in the face and chest multiple times. Marki testified that he and his older siblings had previously been in foster care for several years, residing with Grandmother. They were returned to Mother and Father in 2020. Marki noted that, at first, things went well, but the situation soon deteriorated. He testified that initially, Father would hit Mother once a month, then twice a month, then more often. The children observed the abuse.

---

[4] Father testified he was unaware of the no-contact order, which had been in place since November 2, 2021.

According to Marki, Father also abused him and Tyme during fights with Mother. Father hit Marki in his stomach, chest, and face on multiple occasions. Once, Tyme messed up paint on a wall but insisted to Father, "I swear to God I didn't do it," to which he replied, "F*** your God, I'm your God," and hit her. Marki also remembered seeing Father beat his sister, knocking her tooth out, while they were drunk.

During one fight, when Marki was thirteen or fourteen, Father pointed a gun at him and Mother and said "[s]omething along the lines of 'I could pull the trigger right now, little n*****, keep on looking at me like that.'" Father kept at least two or three loaded guns in the house.[5] The other siblings, including the Child, witnessed this violence. Marki observed that he has never heard the Child speak about Father since entering foster care.

Grandmother testified at trial that she is financially able to care for the Child and his siblings, her home is a safe space for them, and she loves the Child. Grandmother wishes to adopt the Child if given the opportunity. According to Grandmother, she had never met the Child before the youth was placed with her because Father had not let her meet him, but they have bonded quickly and now are together 24/7. When the Child is upset or afraid, has a bad dream, or injures himself, he asks for Grandmother or Mother, who Grandmother allows to visit the children with supervision. Grandmother relates that the Child and his siblings have bonded well, love each other, can tell when another is missing, and are happy to see each other when they get home from school. She recalled first noticing Father's abuse of Mother in 2011, when Father followed Mother to Grandmother's house and punched her in the face during an argument. Grandmother also remembers Father punching Mother in the face five times in Grandmother's driveway in 2015. She related that Father knocked Tyme down on the floor and grabbed her by the arm. She observed Father hit Marki in the chest.

Midway through the trial, the court took a recess for lunch. At this time, Father stated, "I don't have that type of time," and "I won't be back." Upon the court informing Father that was his choice, Father responded, "Y'all didn't give me a fair trial," "This is bulls***, and I'm not coming back." Father never returned to the hearing.

On January 23, 2025, the trial court terminated Father's parental rights on the grounds of persistent conditions and failure to manifest an ability and willingness to care for the Child. The court noted that Father's "aggressive demeanor and words throughout the portion of the trial in which he chose to participate did little to assist the Court to have confidence in his intentions." The court also found that termination was in the Child's best interest. This timely appeal followed.

---

[5] The trial court took judicial notice of the fact that Father was a convicted felon who was not permitted to own handguns since at least 2007.

## II. ISSUES

The following issues were raised by Father:

A. Whether the trial court properly denied Father's attorney's motion to withdraw.

B. Whether the trial court properly allowed Father to testify by audiovisual transmission.

C. Whether the trial court properly determined that grounds existed to terminate Father's parental rights.

D. Whether the trial court properly determined that termination was in the Child's best interest.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing

- 6 -

evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957

S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION

### A.

Father argues that the trial court improperly allowed his appointed counsel to continue representing him after he had discharged her in a letter. We find no abuse of discretion in denying the motion to withdraw.

Once appointed by a court to represent an indigent parent, an attorney must seek leave of the court to withdraw. *In re Jamie B.*, No. M2016-1589-COA-R3-PT, 2017 WL 282955, at *5 (Tenn. Ct. App. June 30, 2017) (citing Tenn. Sup. Ct. R. 13, § 1(e)(5)). "The grant or denial of a request to withdraw as counsel is a matter addressed to the court's discretion." *Odom v. Odom*, No. M2018-00405-COA-R3-PT, 2019 WL 3546437, at *4 (Tenn. Ct. App. Aug. 5, 2019). Our "review of discretionary decisions is limited," and this court neither "'second-guess[es] the court below' nor 'substitutes [its] discretion for the lower court's.'" *Id.* (citing *Beard v. Bd. Of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Father asserts reliance on Rule 1.16(a) of the Tennessee Rules of Professional Conduct, which provides, "Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the lawyer is discharged." Tenn. Sup. Ct. R. 8, Rule 1.16(a)(3).[6] This requirement is generally mandatory. *Odom*, 2019 WL 3546437, at *4. Paragraph (c), however, contains an important exception: "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." Tenn. Sup. Ct. R. 8, Rule 1.16(c).

In the instant case, the trial court denied Father's attorney's motion to withdraw and ordered counsel to continue representing him. Therefore, the attorney was required to continue representing Father "notwithstanding good cause for terminating representation." Tenn. Sup. Ct. R. 8, Rule 1.16(c). The trial court did not abuse its discretion in doing so. The cases cited by Father in opposition to the trial court's ruling are not persuasive, as they do not take into account subsection (c).

The termination petition had been pending since July 2023, over a year prior to trial. The Child had been in DCS custody and had not seen Father since May 2022, two-and-a-

---

[6] Citations are to the version of the rule in effect when the petition was filed, July 14, 2023.

half years before trial. Yet Father waited until the eve of trial to discharge his court-appointed attorney. Father's stated reason for discharging the attorney was the claim that nothing had been done to prohibit DCS from adding the ground of severe child abuse. DCS, however, voluntarily dismissed that ground, rendering Father's reason moot. The court also found that Father's decision to discharge his attorney was an attempt to delay the proceeding. As such, the trial court's denial of the motion to withdraw was consistent with "the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding . . . not be delayed any longer than is absolutely necessary consistent with the rights of all parties." Tenn. Code Ann. § 36-1-124(c) (emphasis added).

Additionally, the trial court's discretionary decision did not harm Father, who benefitted from his attorney's zealous advocacy at trial. The attorney made objections, cross-examined witnesses and thoroughly represented his position. Father made no mention of disagreement with counsel at any point during trial. The trial court specifically noted that "[a]t no time during the hearing did [Father] indicate his attorney was acting in a way he felt was contrary to his interests." Father does not claim, and there is no indication in the record, that his rights would have been better protected by granting his attorney's motion to withdraw. Accordingly, the trial court did not abuse its discretion when it denied Father's attorney's motion to withdraw.

**B.**

Father argues that the trial court erred in denying his motion to continue because "there was no order allowing him to appear by Zoom." Father argues that Rule 43.01 of the Tennessee Rules of Civil Procedure was not followed because no party filed a motion to request that he be allowed to testify audio-visually and no court order was entered prior to trial.

A trial court's decision to grant or deny a motion for continuance is discretionary. *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997). A trial court's denial of a continuance is "fact-specific and 'should be viewed in the context of all the circumstances existing' at the time of the request.'" *In re Trinity P.*, No. E2019-01251-COA-R3-PT, 2020 WL 995788, at *4 (Tenn. Ct. App. Mar. 2, 2020) (quoting *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). Such circumstances include: "(1) the length of time the proceeding has been pending, (2) the reasons for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (quoting *Nagarajan*, 151 S.W.3d at 172). "The party seeking a continuance bears the burden of establishing the circumstances that justify the continuance." *In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019). The termination statute provides, "at the discretion of the court," an incarcerated parent's participation at trial "may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be

appropriate under the circumstances." Tenn. Code Ann. § 36-1-113(f)(3) (West eff. July 1, 2023, to June 30, 2024).[7]

Under the circumstances, good cause existed to justify Father's participation at trial via Zoom. The Child had been in DCS custody and Father had been incarcerated since May 7, 2022. The termination petition had been pending since July 14, 2023, and the proceeding had already been continued several times for various reasons. On November 19, 2024, the court entered an order from a July 25, 2024 hearing that required Father be transported from jail to the courthouse for trial. At trial, Father's attorney verbally moved to continue because Father was not in-person but was on Zoom. The court denied Father's motion because the sheriff's office "would not honor" the court's prior order,[8] the termination statute does not require Father to attend in-person, and Father was not disadvantaged by appearing via Zoom. In our view, the trial court did not abuse its discretion.

The trial court's denial of the continuance was consistent with the need for expedience in termination proceedings and the importance of establishing permanency for the Child at an early date. *See* Tenn. Code Ann. §§ 36-1-113(k) (requiring a hearing on a termination petition within six months); 36-1-124(a) (requiring that termination proceedings be expedited, not delayed, and given priority); *see also* Tenn. Code Ann. § 36-1-124(c) ("It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority . . . ."); *In re Bentley J.*, No. M2022-00077-COA-R3-PT, 2022 WL 16559454, at *5 (Tenn. Ct. App. Nov. 1, 2022) (noting "it is clear that termination cases are to be expedited where possible" when affirming the denial of a continuance).

Additionally, Father was caused neither great injustice nor injury. He participated meaningfully: he was able to testify, his attorney cross-examined him, and he even objected on his own behalf more than once. The court also offered multiple times to put Father and his attorney in a breakout room and give them "plenty of opportunity" to speak privately if anything arose during the proceedings that Father wished to discuss with his attorney. Eventually, Father took the court up on this offer. When the court took a break for lunch and Father removed himself from the proceedings, the court left the Zoom meeting open, but Father never returned.

Thus, the trial court did not abuse its discretion by allowing Father to testify at the trial by Zoom. *See In re Bentley J.*, 2022 WL 16559454, at *4 (affirming denial of motion

---

[7] Citations are to the version of the statute in effect when the petition was filed on July 14, 2023. This provision is currently located at Tenn. Code Ann § 36-1-113(f)(1)(B)(ii) and applies only when an incarcerated parent files a timely written answer.

[8] The reason for the sheriff's office failure to transport Father for trial is not included in the record.

to continue due to the time the children had been in state custody, the lateness of the motion, and the parent's ability to participate in the hearing by Zoom).

## C.

DCS sought termination based upon the statutory grounds of persistence of conditions which led to removal and a failure to manifest an ability and willingness to assume custody of the Child.

Courts may terminate a parent's rights on the ground of persistent conditions based on the following:

(A) The Child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i) The conditions that led to the Child's removal still persist, preventing the Child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the Child to be subjected to further abuse or neglect, preventing the Child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the Child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S. W.3d at 550.

"The purpose behind this ground is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008) (emphasis added). The failure to remedy the conditions need not be willful. *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012). "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the Child

- 11 -

to the parent in the near future is justified." *Id.* (citing *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)).

As a threshold matter, the Child had been removed from Father's home and custody by order of a court for a period of at least six months. Tenn. Code. Ann. § 36-1-113(g)(3)(A) & (B). Upon DCS's filing of the dependency and neglect petition, the juvenile court entered an order placing the Child in state custody on October 21, 2021. The termination trial was first set to be heard more than six months later on April 11, 2024, and was eventually held on November 21, 2024.

First, the conditions that led to the Child's removal still persisted at trial. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). The Child was removed from Father's custody on October 21, 2021, due to domestic violence between Father and Mother. Father did not turn the Child over to DCS at that time; instead, he was arrested on May 7, 2022, at which time the Child was placed in foster care, where he has remained ever since due to Father's continuous incarceration. Father and the Child have not seen each other since May 7, 2022. Father also abused two of the Child's sisters and his half-brother, and the Child and his siblings all witnessed Father's abuse of them and Mother. Father's criminal convictions—many related to domestic violence—also go back nearly twenty years. Father, however, declined to accept that he ever abused Mother. *See In re Emberley W.*, No. M2022-00157-COA-R3-PT, 2023 WL 180080, at *9 (Tenn. Ct. App. Jan. 13, 2023) (affirming the ground of persistence of conditions based, in part, on the findings of father's domestic violence against mother, criminal activity, and incarceration, and father's minimization of and failure to address such issues).

At trial, Father remained incarcerated. Although he testified as to his intentions once released from jail, he did not have housing or employment and had not complied with the responsibilities in his permanency plan. Despite testifying that he completed an anger management course while incarcerated, he "became extremely irate multiple times" during trial and "had to be redirected several times by the Court to calm down."

Second, there was little likelihood these conditions would be remedied at all, much less at an early date in order that the Child can be reunited with Father. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Father had been incarcerated for nearly all the custodial episode, including at trial, and had only allegedly completed anger management classes to progress toward reunifying with the Child. Father has appeared to learn little, if anything, from his anger management classes, as his outbursts and tone in court revealed.[9]

Third, continuing Father's and the Child's relationship would greatly diminish the Child's chances of early integration into a safe, stable, and permanent home. *See* Tenn.

_____

[9] Father swore multiple times, challenged and argued with the attorneys and the court, tried to avoid answering questions, and eventually left and did not return to the trial.

- 12 -

Code Ann. § 36-1-113(g)(3)(A)(iii). Father and the Child have no bond because they had not seen each other in two-and-a-half years as of the date of trial, and Father has made little, if any, progress toward reunification. Father had not sought to lift a no-contact order that existed between himself and the Child that had been in place since November 2, 2021. The Child has been in a loving, pre-adoptive home with Grandmother and his biological siblings, all of whom Grandmother had adopted, for the entire custodial episode. The Child is doing well and has bonded with Grandmother and his sisters. Therefore, the record reveals that the trial court properly terminated Father's rights on this ground.

The trial court also found that Father failed to manifest an ability and willingness to assume custody of the Child. Parental rights may be terminated when the parent "has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

As to the first element, the Tennessee Supreme Court has held that it "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Accordingly, the first element is satisfied if the petitioner proves by clear and convincing evidence that the parent "has failed to manifest either ability or willingness." *Id.* (emphasis in original).

Father failed to manifest an ability and willingness to personally assume custody of the Child. "Ability focuses on the parent's lifestyle and circumstances." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). As for willingness, this Court "look[s] for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Rather, parents demonstrate willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

Here, Father was both unable and unwilling to assume custody of the Child. He had been incarcerated for over two-and-a-half years as of the date of trial. Father also demonstrated nearly twenty years of criminal behavior, and testimony showed over a decade of domestic violence issues. Even while incarcerated, Father had some "disciplinaries." He testified he completed anger management classes, but he provided no documentation to DCS, and his behavior at trial showed he had learned little, if anything, from such classes. Father claimed he would do whatever DCS needed him to do to reunite with the Child, but "mere words" are insufficient, and Father had not completed parenting

classes or a mental health evaluation[10] and had not sought to lift the no-contact order.

The second element requires a showing that placing the Child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The risk must be "a real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). It need not be inevitable but must be sufficiently probable to prompt a reasonable person to believe that the harm will more likely than not occur. *Id.* In *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467 (Tenn. Ct. App. Jan. 29, 2021) this court identified several circumstances that support a substantial-harm finding for this ground:

> By way of illustration, forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable. Or placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm. And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm.

*Id.* at *6 (internal citations omitted) (collecting cases).

In the instant case, all three circumstances are present. First, Father is a near-stranger to the Child. Father and the Child had not seen each other since May 7, 2022, when the Child was two-and-a-half years old. While in foster care, the Child neither talked nor asked about Father. Second, Father engaged in repeated criminal conduct requiring incarceration. He pled guilty to assault four times, dating back to 2006, and once to custodial interference involving the Child. Father had been incarcerated at least seven times since he was 18, and he had been incarcerated for over two-and-a-half years as of the date of trial. Third, Father had a significant, recent history of domestic violence. Domestic violence between Father and Mother caused the court to place the Child in DCS custody. And Marki's and Grandmother's respective testimonies showed Father had a history of domestic violence dating back at least a decade, including punching and kicking Mother; hitting Marki, Tyme, and Macie; swearing at and insulting Marki and Tyme; and even knocking out his sister's tooth. For these reasons, the trial court properly terminated Father's rights on this ground.

---

[10] Father testified that the jail did not offer parenting classes and he could not complete a mental health evaluation without a court order, but the record lacks any evidence that Father attempted to overcome these hurdles or accomplish these tasks another way. DCS had been relieved of reasonable efforts after the finding that Father severely abused Marki.

**D.**

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Father's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *Id.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)  The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)  Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)  Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)  Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

- 15 -

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

The trial court held that 15 of the 20 factors weighed in favor of termination. The court held that factors (L), (S), and (T) weighed neither for nor against termination and that factors (G) and (O) weighed against termination. The trial court properly weighed the factors to determine that termination is in the Child's best interest.

First, the court considers "factors related to the child's emotional needs." *In re Chayson D.*, 2023 WL 3451538, at \*14; *see* Tenn. Code Ann. § 36-1-113(i)(1)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), and (I) (involving the child's relationships with others).

Here, the Child needs stability, and termination would provide him with it. The Child has been continually in Grandmother's pre-adoptive foster home with his four sisters—all of whom Grandmother has adopted and with whom the Child has bonded—since removal from Father's custody. There is no parent-child attachment, let alone a secure one, because there is a no-contact order between Father and the Child; they have not seen or visited each other since Father's incarceration on May 7, 2022; and the Child neither talks nor asks about Father. Father testified that he supported and fed the Child and was his favorite person prior to removal, but the court found Father's testimony was not credible.

Second, the court considers "factors involving the physical environment of the child and the parent." *In re Chayson D.*, 2023 WL 3451538, at \*15; *see* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (N) (involving any abuse or neglect present in the parent's home), (Q) (involving the parent's commitment to having a home that meets the child's needs), and (R) (involving the health and safety of the home).

Father consistently abused his family members—his wife, children, and sister—for over a decade; he had punched and kicked Mother, hit and/or insulted Marki, Tyme, and Macie, and knocked his sister's tooth out. The Child witnessed this violence. A home full of domestic violence cannot be healthy, safe, or one that meets a child's needs. *See In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at \*5 (Tenn. Ct. App. Oct. 31, 2006) ("Certainly the history of child abuse in [m]other's household would raise concerns about the health of these children, should they be returned to [m]other. There was also a history of domestic violence between [m]other and her partners."). And, as discussed above, Father's home could not be healthy or safe for the Child because he remained incarcerated.

Third and finally, the court considers factors concerning the efforts made by Father. *In re Chayson D.*, 2023 WL 3451538, at \*15; *see* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), and (P) (involving the parent's

understanding of the child's basic needs).

Father made very few efforts toward reunifying with the Child. Father testified he completed anger management classes while incarcerated, but DCS had no record of such completion, and his behavior at trial indicated he had not learned lessons from the classes. He neither completed nor requested assistance with parenting classes, a mental health evaluation, or visiting the Child. While Father argues that he was unable to complete additional services because of his incarceration, Father's actions alone caused his incarceration. Father testified that he would not have his own home but would live with his aunt and uncle after release from jail. And he claimed he would get a job through the office of reentry, HopeWorks, or PeopleReady. Despite evidence that Father's criminal behavior dates back almost twenty years and his domestic violence dates back over a decade, Father claimed he had never struck Mother, indicating he did not appreciate the severity of the problem and no understanding that the Child needs a home free from crime and abuse. *See In re Emberley W.*, 2023 WL 180080, at *11 (finding that "[f]ather's history of domestic violence issues, fighting, and screaming profanity at the child" weighed in favor of termination).

The trial court considered all the evidence, weighed the credibility of the witnesses, and properly determined that termination was in the Child's best interest. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Father's parental rights was in the Child's best interest.

## V. CONCLUSION

The judgment of the trial court is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary and consistent with this opinion. Costs of this appeal are assessed against the appellant Fred M.

_____
JOHN W. MCCLARTY, JUDGE